STATE OF NEW YORK, Plaintiff,

v.

CEDAR PARK CONCRETE CORP., et al., Defendants.

STATE OF NEW YORK, Plaintiff,

v.

CENTURY–MAXIM CONSTRUCTION CORP., et al., Defendants.

Nos. 85 CIV 1887 (LBS), 86 CIV 8128 (LBS).

United States District Court, S.D. New York.

June 25, 1987.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, for plaintiff; Lloyd Constantine, Chief, Antitrust Bureau, Alice McInerney, Asst. Atty. Gen., Carol Antonacci, Asst. Atty. Gen., of counsel.

Murray, Hollander, Sullivan & Bass, New York City, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for defendants Cedar Park Concrete Corp. and Cedar Park Const. Corp.

Stillman, Friedman & Shaw, P.C., New York City, for defendants S & A Concrete Co., Inc., S & S Structures, Inc., A & S Structures, Inc., A & S Concrete Co., and Nicholas Auletta.

Gerald L. Shargel, New York City, for defendant G & G Concrete Corp.; Meister Leventhal & Slade, of counsel.

Gerald Lefcourt, New York City, for defendant Marine Pollution Service, Inc. d/b/a Certified Concrete Co.

Parcher, Arisohn & Hayes, New York City, for defendants North Berry Const. Corp. and Joseph Martinelli.

Sylvor, Schneer, Gold & Morelli, New York City, for defendants Julius Nasso Concrete Corp. and Nasso-S & A, a Joint Venture.

Goldman & Hafetz, New York City, Greene & Zinner, White Plains, N.Y., for defendants Transit-Mix Concrete Corp. and Edward Halloran.

Shea & Gould, New York City, for defendant Century-Maxim Const. Corp.

Patrick Wall, P.C., New York City, for defendant Alvin O. Chattin.

Golenbock and Barell, New York City, for defendants THE DIC Concrete Corp., DIC Industries, Inc., Underhill Const. Corp., Underhill Industries Inc., THE DIC Concrete Corp. and Underhill Const. Corp., a Joint Venture, DIC–Underhill Industries, a Joint Venture, IIJ Enterprises, Inc.

Obermaier, Morvillo & Abramowitz, P.C., New York City, for defendants Joseph Depaola, Walter Goldstein, and Frank Phelan.

## OPINION

SAND, District Judge.

The State of New York initiated this antitrust litigation by filing complaints (85 Civ. 1887 and 86 Civ. 8128) in this Court against more than thirty named defendants, all alleged participants in a collusive bid-rigging and market allocation scheme which allegedly pervaded and still permeates the New York City market for "major reinforced-concrete superstructure construction work." *Cedar Park* Amended Complaint, 85 Civ. 1887, Preliminary Statement.[1] Plaintiff seeks treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and sections 340 and 342-b of the New York General Business Law, a statute commonly known as the "Donnelly Act,"

---

1. Except for the identities of the defendants and co-conspirators named, the Amended Complaint in *State of New York v. Cedar Park, et al.*, 85 Civ. 1887, and the complaint in *State of New York v. Century-Maxim Construction Corp., et al.*, 85 Civ. 8128, are virtually identical.

for the monetary injury the State and its political subdivisions have allegedly sustained by reason of the defendants' alleged antitrust violations. In addition, plaintiff prays for an injunction against further violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and section 340 of the Donnelly Act, as well as the imposition of civil penalties under the Donnelly Act. Presently pending before the Court is an array of motions to dismiss all or portions of the complaints. The motions are granted in part, denied in part, and reserved in part, all as set forth below.

## I. *The Complaints*

A brief examination of the identity of the parties and the scope of the allegations provides an appropriate frame of reference. The State of New York is named as the plaintiff in the complaints. It sues "(a) in its sovereign and proprietary capacities, (b) on behalf of governmental agencies, political subdivisions, and public authorities of the State of New York, including the New York Convention Center Development Corporation, which is a subsidiary of the New York State Urban Development Corporation, and (c) as *parens patriae* for injunctive relief on behalf of citizens of the State of New York." *Cedar Park* Amended Complaint ¶ 5.

The defendants may loosely be grouped in several categories based on the nature of their involvement in New York City's major reinforced-concrete superstructure construction market. One group of defendants consists of entities which produce and sell ready-mix concrete. A second category embraces entities which perform building construction work on high-rise structures in New York City. A third group includes individuals who allegedly own or play major roles in the management of various of the corporate defendants which are named as co-conspirators. Finally, the complaints name John Does I–X as participating co-conspirators.

Plaintiff alleges that beginning as early as 1978 and continuing to the present, the defendants conspired to, and did in fact, rig bids and allocate work in both private and public sector projects for the construction of New York City high-rise structures. The complaints charge, for example, that the defendants agreed on "which concrete subcontractor would submit the winning bid" on major high-rise building projects, *Cedar Park* Amended Complaint ¶ 36(a), as well as "the amounts of the bids." *Id.* ¶ 36(b). Collusive market allocation was further maintained, the State alleges, in part "with threats of labor and ready-mix concrete supply problems ..." *Id.* ¶ 36(c). Many specific acts in furtherance of the alleged conspiracy are outlined in the complaints and it would serve little purpose to paraphrase all of the allegations here. It suffices to say that the complaints cite to numerous building construction projects which plaintiff alleges were part of the allocation scheme. In identifying these projects, the complaints outline scores of overt acts which were allegedly committed to effectuate the collusive division and allocation of the relevant market. For example, the *Cedar Park* Amended Complaint alleges that the defendants agreed that Nasso-S & A would submit the winning bid, and defendant Dic-Underhill would submit a higher complementary bid, on a designated portion of the major reinforced-concrete superstructure construction work at the New York Convention and Exposition Center (the "Convention Center") on Manhattan's West Side. *Cedar Park* Amended Complaint ¶ 37(e). It is further alleged in connection with the Convention Center project that other co-conspirator defendants agreed not to submit bids, and non-conspirator concrete subcontractors "were coerced into not submitting bids." *Id.* Another example of acts allegedly committed in furtherance of the conspiracy recites that alleged co-conspirator defendants Joseph DePaola and Walter Goldstein forced a non-party to agree to a joint venture with defendant Dic-Underhill for the construction of the so-called Harlem Interfaith Project by threatening the third party with labor and supply problems if he tried to perform the work alone. *Id.* ¶ 37(a).

## II. *New York State as a Party and the Claims of Injury*

Defendants contend that New York State is an improper party plaintiff in these pro-

ceedings. Defendants argue, for example, that the complaints fail to establish that the plaintiff has complied with statutory requirements which would permit it to sue as a representative party. In addition, focusing particularly on the specific allegations of antitrust injury in the complaints, defendants contend that the complaints are insufficient. In certain respects, as set forth below, we agree with defendants' position.

### A. The Request for Injunctive Relief: The State as a Party

■ The assertion that the State of New York is not the proper party plaintiff in these actions appears in part to have been based on defendants' belief that plaintiff had attempted in the complaints to state treble damages claims on behalf of private citizens of New York State. Apparently, the fact that the complaints state that citizens of the State of New York were injured as direct purchasers of relevant services from the defendants led to the confusion. *See, e.g., Cedar Park* Amended Complaint ¶ 5. At oral argument, the State clarified this point, and explained that there is no such damages claim. However, the State, as *parens patriae*, does seek injunctive relief under both federal and state law alleging, *inter alia*, injury to the "general economy of the State of New York," *see, e.g., Cedar Park* Amended Complaint ¶ 5(d), and therefore, is a proper party for those purposes.

### B. Antitrust Damages Claims of the State and Subdivisions

The defendants attack the State's status as a party litigating in a representative capacity for an award of damages. As noted earlier, the complaints allege that plaintiff maintains the actions not only in its own sovereign and proprietary capacity but also "on behalf of governmental agencies, political subdivisions and public authorities of the State of New York, including the New York Convention Center Development Corporation, which is a subsidiary of the New York State Urban Development Corporation." *See, e.g., Cedar Park* Amended Complaint ¶ 5. Defendants con-

tend that the assertion in the complaints that the State is suing partly in this representative capacity is not a sufficient predicate which permits the State to sue on behalf of unidentified subdivisions. They further state that they are entitled to know, for example, for *res judicata* purposes, which entities they are facing and who is asserting damages claims. *See* Transcript of Proceedings, 85 Civ. 1887, at 24 (March 26, 1987). Plaintiff, by contrast, contends that under Fed.R.Civ.P. Rule 17(a), a complaint may be brought by one who sues for the benefit of other parties without naming those beneficiaries as parties.

■ Under Rule 17(a), a party may sue on behalf of one it represents as long as the relevant underlying federal and state statutes authorize such a suit. *See* 3A J. Moore & J. Lucas, *Moore's Federal Practice*, ¶ 17.14 (2d ed. 1986). New York State's Donnelly Act provides in pertinent part at section 342-b that:

> In addition to existing statutory authority to bring such actions on behalf of the state and public authorities, the attorney general may also bring action on behalf of any political subdivision or public authority of the state upon the request of such political subdivision or public authority to recover damages for violations of section three hundred forty of this article, or to recover damages provided for by federal law for violations of the federal antitrust laws.

We note also that the Urban Development Corporation ("UDC") statute confers authority on the Attorney General to "render such services ... as may be requested by the corporation." N.Y.Unconsol.Laws § 6279(1).

■ With respect to the federal and state antitrust treble damages claims asserted on behalf of the UDC, the State has submitted an affidavit of Morris Dershowitz, Vice President/Law and General Counsel of the New York Convention Center Development Corporation. In this affidavit, Dershowitz affirms that the organization has requested that the Attorney Gen-

eral pursue its antitrust claims relating to the construction of the Convention Center. In our view, this provides a sufficient predicate for the Attorney General to sue for damages on the UDC's behalf.

The other State subdivisions on whose behalf the State of New York sues, however, are not named in the complaints. The State acknowledges that at an early point in the litigation, it will have to identify the specific subdivisions on whose behalf it is suing. Plaintiff also recognizes that under the Donnelly Act, a class action may be brought by the State on behalf of its subdivisions and that "any governmental entity that does not affirmatively exclude itself from the action, upon due notice thereof, shall be deemed to have requested to be treated as a member of the class represented in that action." N.Y.Gen.Bus.Law § 342–b. The present actions, however, are not styled as class actions.

■ In view of the need early in the litigation to identify State-affiliated purchasers, we believe the complaints should be dismissed insofar as they purport to state treble damages claims on behalf of unidentified state subdivisions. Accordingly, we hold that insofar as the complaints allege federal and state antitrust damages claims on behalf of State subdivisions other than the UDC, they are dismissed without prejudice to repleading within 60 days.

### C. *Direct Injury*

It is a settled principle of federal antitrust law that generally, only one who directly purchases products from an alleged antitrust violator may sue for treble damages under the Clayton Act. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729, 97 S.Ct. 2061, 2066, 52 L.Ed.2d 707 (1977). Defendants argue that the complaints run afoul of this principle by failing to allege sufficiently that the State or its subdivisions directly purchased products from the defendants. Because we have dismissed the complaints to the extent that they purport to assert treble damages claims on behalf of State entities other than the State and the UDC, we need only address defendants' *Illinois Brick* argument as it relates

to the claims asserted by the State on its own behalf and on behalf of the UDC. In this context, the defendants' position is unpersuasive.

■ The complaints aver generally that the alleged antitrust violations have caused injury to the State and the UDC as direct purchasers of major reinforced-concrete superstructure work. *See, e.g., Cedar Park* Amended Complaint ¶ 5. It is true that the complaints do not specifically identify public projects pursuant to which the State of New York purchased major reinforced-concrete superstructure construction work in New York City from any of the defendants. It is the theory of the complaints, however, that any and all of such work which the defendants performed for the State itself from as early as 1978 through the present was performed pursuant to the illegal agreement. Thus, while the complaints do not specify each project involved, the State's allegations encompass the totality of New York City major reinforced-concrete superstructure projects in which the State purchased services or material from the defendants. With respect to the UDC, the project which allegedly caused a direct injury has been identified. Fairly construed, therefore, the complaints contain the required allegations of direct injury to both the State of New York and the UDC.

### III. *Alleged Grand Jury Abuse*

One of the issues which has emerged as central in the pre-trial phase of this litigation concerns the interrelationship between the Attorney General's civil and criminal investigations of the defendants. Defendants contend that there has been improper use of grand jury material and unlawful disclosures between individuals within the Attorney General's office. We disagree and deny defendants' motion to dismiss the complaints based on alleged grand jury abuse.

In 1982, the Attorney General commenced an antitrust investigation of the ready-mix concrete industry in New York City pursuant to General Business Law section 343. In December 1984, a grand jury was convened to investigate possible

criminal offenses committed in this industry. The investigation proceeded but, in 1986, the grand jury's term expired without filing any charges. *See* Affidavit of Alice McInerney, Assistant Attorney General, 85 Civ. 1887; 86 Civ. 8128 ("McInerney Affidavit"), at ¶ 4 (March 16, 1987). Subsequent to the convening of the grand jury, the Attorney General filed the present civil antitrust complaints. The *Cedar Park* action was commenced in March 1985, some three months after the grand jury was convened. The *Century-Maxim* case was filed in October 1986. It should be noted that prior to the filing of either of these actions and the convening of the grand jury, the State commenced in this district an action captioned *State of New York v. Transit Mix Concrete Corp., et al.,* 84 Civ. 4194 (JES), in which the State seeks, *inter alia,* to prevent and restrain violations of section 7 of the Clayton Act, 15 U.S.C. § 18, and sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Many of the defendants in the *Transit Mix* case are also named in these actions.

The lead attorney for the State in these cases, Alice McInerney, affirms that "[t]he same attorneys conducted the § 343 investigation, drafted the civil pleadings and conducted the grand jury." McInerney Affidavit ¶ 6. It is precisely this overlap which predicates the defendants' contentions of grand jury abuse, at least as those contentions were originally framed.

Defendants assert a factual foundation for the grand jury abuse arguments by directing the Court's attention to specific events which occurred during the criminal and civil investigations. For example, defendants point out that the grand jury subpoenaed certain documents of defendant Century-Maxim during the criminal investigation. When the grand jury's term expired, an Assistant Attorney General wrote to Century-Maxim's attorney and informed him that the subpoenaed documents were being returned but that they should be retained for production in the two civil antitrust cases. *See* Affidavit of Michael S. Feldberg, Esq., Exhs. B & C.

The circumstances which defendants recite do not lead to the conclusion that there has been impermissible disclosure. Rather, these circumstances appear to be consistent with the Attorney General's affirmation that the same attorneys worked on both investigations—a circumstance which, as we will discuss below, is expressly approved in *United States v. John Doe, Inc. I.,* — U.S. ——, 107 S.Ct. 1656, 95 L.Ed.2d 94 (1987). Thus, the defendants assert that the same Department of Law attorneys who conducted the grand jury investigation are using materials gathered therein to litigate these civil actions. In this context, it is argued, disclosure of such materials is inherent. *See* Defendant Century-Maxim Construction Corp.'s Reply Memorandum of Law at 4. The alleged disclosure of grand jury material originated unlawfully, the defendants contend, in part because the State failed to seek and obtain a court order under Fed.R.Crim.P. Rule 6(e) before using such material.

While the grand jury has long been a part of our system of justice and is enshrined in the Constitution, the law of grand jury secrecy has been recently evolving. Indeed, when the original moving papers were filed in these actions, the Supreme Court had yet to decide *John Doe.* Subsequent to the Supreme Court's decision in *John Doe,* the parties submitted supplemental letters which set forth their respective positions with respect to the relevance of *John Doe* to this case.

*John Doe* resolved an important issue left open by the Supreme Court's previous decision in *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). *Sells* addressed a particular fact pattern involving the use and disclosure of grand jury material in civil proceedings. The defendants in *Sells,* a corporation and two of its officers, had been indicted by a federal grand jury on two counts of conspiracy to defraud the United States as well as nine counts of tax fraud. Subsequent to the indictment, the original officers of the corporate defendant reached a plea agreement with the prosecution. The government then moved for the disclosure of all grand jury materials to

attorneys in the Civil Division of the Department of Justice, their support staff, and certain Defense Department experts for use in a contemplated civil suit against the defendants under the False Claims Act. The district court granted the government's motion, ruling that Rule 6(e)(3)(A)(i) entitles Civil Division attorneys as a matter of right to have access to grand jury materials. On appeal, the Ninth Circuit vacated and remanded the district court's decision, holding that disclosure of the grand jury materials to the Civil Division attorneys could only be obtained by demonstrating to a court that there was a "particularized need" for such disclosure. *In re Grand Jury Investigation No. 78–184 (Sells, Inc.),* 642 F.2d 1184 (9th Cir.1981). The Ninth Circuit held that under the facts of the case, the required showing had not been made.

The Supreme Court affirmed the Ninth Circuit's decision. The Court held that attorneys in the Civil Division of the United States Department of Justice and their staff, who played no part in the criminal prosecution of the civil defendants, could not obtain automatic disclosure of grand jury material for use in the civil proceedings. Instead, the Court held, disclosure in such circumstances is permissible only pursuant to a court order under Rule 6(e)(3)(C)(i), available upon a showing of "particularized need." 463 U.S. at 443, 103 S.Ct. at 3148. In explaining this outcome, the Court focused on the "affirmative mischief" which "disclosure [of grand jury material] for civil use" threatened. 463 U.S. at 431, 103 S.Ct. at 3142. However, the Court expressly declined to address "any issue concerning continued use of grand jury materials, in the civil phase of a dispute, by an attorney who himself conducted the criminal prosecution." 463 U.S. at 431 n. 15, 103 S.Ct. at 3141 n. 15.

*John Doe* answered the question of continued use which was not decided in *Sells.* In *John Doe,* as in this case, a grand jury investigation of alleged criminal antitrust violations was terminated without the return of any indictments. After the grand jury was discharged, and in connection with a possible civil action against the same defendants who had been targets of the criminal investigation, the attorneys who had conducted the grand jury proceedings sought production of various documents by service of Civil Investigative Demands (CIDs) on a number of persons and entities. *John Doe,* — U.S. at —, 107 S.Ct. at 1658. The Antitrust Division then advised the respondents that they could comply with the CIDs by certifying that the documents called for had previously been provided to the grand jury. Two of the respondents refused, and later moved, *inter alia,* to enjoin the Government from using the grand jury information in "preparing, filing, or litigating" the civil action. *Id.* at —, 107 S.Ct. at 1659.

The district court denied the requested relief, but the Second Circuit reversed after expedited consideration. *In re Grand Jury Investigation,* 774 F.2d 34 (2d Cir. 1985). The Second Circuit held that inasmuch as the attorneys who had worked on the criminal investigation were then involved only in civil proceedings, they were prohibited from making continued use of the grand jury material without a court order of disclosure.

The Supreme Court reversed this holding. Emphasizing the language of Fed.R. Crim.P. 6(e), the Court held that "[t]he Rule does not contain a prohibition against the continued use of information by attorneys who legitimately obtained access to the information through the grand jury investigation." *Id.* — U.S. at —, 107 S.Ct. at 1660. Noting that the "[m]ere 'use' of grand jury information in the preparation of a civil complaint would not constitute prohibited disclosure," *see id.* at n. 6, the Supreme Court reasoned that "a solitary reexamination of [grand jury] material in the privacy of an attorney's office" does not fall within the disclosure prohibitions contained in Rule 6. *Id.* at — — —, 107 S.Ct. at 1660–61. Accordingly, the Court declined to require that the previously involved attorneys show a particularized need for reviewing the grand jury material in connection with the civil proceedings.

The opinions in *Sells* and *John Doe* reflect competing concerns which are not easily reconciled. One finds in the cases a somewhat shifting focus. *Sells* reflects a commitment to the preservation of grand jury privacy and bespeaks a deep concern about allowing the use of grand jury material in civil cases. *John Doe* places more emphasis on the definition of disclosure and expressly declines to address grand jury privacy issues.[2] *John Doe*, at ——, 107 S.Ct. at 1661.

▇ In our view, *John Doe* controls this case and mandates that we deny defendants' motion to the extent that it is based on a violation of the requirements of Fed. R.Crim.P. 6(e). First, we find no evidence of improper use or disclosure of grand jury material in this case. The complaints themselves do not lead us to the conclusion that there has been improper disclosure. It cannot be inferred simply from the timing and scope of the various investigations that the complaints disclose to outsiders grand jury material. *John Doe*, at ——, 107 S.Ct. at 1661. With respect to the examination of grand jury material in the civil phase of this litigation, we look to the affidavit of Assistant Attorney General Alice McInerney. As we read paragraphs 6 and 8 of the McInerney Affidavit, there has been no disclosure of grand jury material to attorneys who did not previously have access to such material during the course of the criminal investigation.

We note in this context that after *John Doe* was decided, the defendants, in a letter to the Court, reshaped their arguments somewhat. Rather than relying on the previous contention that the same attorneys conducted both the criminal investigation and the civil proceedings to date, the defendants stated that they believed that the attorneys in charge of the civil proceedings were not involved in the criminal investigation. *See* Letter of Michael Feldberg (May

5, 1987). Again, it is our understanding, and we base our holding on this understanding, that every Department of Law attorney who has examined grand jury material subsequent to the expiration of the grand jury is an individual who formerly had access to such material during the criminal investigation.[3]

Defendants also contend that the conduct of the Attorney General's office violated New York State's Criminal Procedure Law section 190.25(4). This section provides in pertinent part:

> For the purpose of assisting the grand jury in conducting its investigation, evidence obtained by a grand jury may be independently examined by the district attorney, members of his staff, police officers specifically assigned to the investigation, and such other persons as the court may specifically authorize. Such evidence may not be disclosed to other persons without a court order.

▇ In this case, it does not appear that the Attorney General has used grand jury material in the civil proceedings or disclosed such material to "other persons" not involved in the criminal investigation. The continued access that attorneys previously involved in the grand jury proceedings had to the secret materials is not of itself violative of CPL section 190.25(4).

Defendants rely on *Matter of Dist. Atty. of Suffolk County*, 58 N.Y.2d 436, 461 N.Y.S.2d 773, 448 N.E.2d 440 (Ct.App. 1983), to support the contention that there have been improper disclosures. In that case, the prosecutor received emergency authority of the Suffolk County Legislature to commence a federal civil damages suit under the RICO statute based upon conduct previously explored by a Suffolk County grand jury which had expired without returning criminal charges. Following the discharge of the grand jury, two assist-

---

**2.** It is interesting to note that both *Sells* and *Doe* were decided over bitter dissents. Indeed, three members of the *Sells* majority, including Justice Brennan, the author of *Sells,* dissented in *John Doe.* Only Justice Stevens was in the majority in both cases.

**3.** In defendants' recent letter to the Court, they request an evidentiary hearing to explore, among other things, the procedures used to segregate attorneys and information within the Attorney General's office. *See* Letter of Michael Feldberg, Esq. (May 5, 1987). The request is denied.

ants to the Suffolk County District Attorney "were sworn in, anticipatorily, as Special Assistant County Attorneys so that, with the aid of at least one outside consultant, they could work up the civil suit." 461 N.Y.S.2d at 775 n. 4, 448 N.E.2d at 442 n. 4. On the day the District Attorney received county authorization to pursue the civil suit on its behalf, he filed that suit in federal court and obtained an *ex parte* order from a Suffolk County Court judge granting him what the Court of Appeals described as "blanket approval to employ" the grand jury minutes in the civil litigation. *Id.* 461 N.Y.S. 2d at 775, 448 N.E.2d at 442. According to the Court of Appeals, the order of the County Court judge "broadly and unqualifiedly provided that 'the District Attorney of Suffolk County, his appointed staff, special counsel, experts and consultants be authorized and permitted to utilize, the Grand Jury transcripts ... in the ... civil proceedings.'" *Id.* (quoting from County Court Order).

On these facts, the New York State Court of Appeals found that CPL section 190.25(4) had been violated. The secrecy of the grand jury had been invaded without the required showing of a "particularized need." *Id.* 461 N.Y.S. 2d at 777, 448 N.E.2d at 444.

In this case, as we have noted, the Attorney General affirms that there has been no disclosure to persons who had not already had access to the grand jury material in the course of the criminal investigation. In this respect alone, this case is distinguishable from *Suffolk County.* In addition, we note that the New York State Attorney General in enforcing the state antitrust law, is statutorily vested with authority to pursue both criminal and civil litigation, although in some instances, both avenues may not be pursued simultaneously. *See People v. Gold Medal Farms, Inc.,* 113 Misc.2d 574, 449 N.Y.S.2d 618 (S.Ct.Bronx Co.1982). Where the same state attorneys investigate both avenues in the discharge of their duties, it cannot be said *ipso facto* that there has been an illegal disclosure of grand jury material to "other persons" within the meaning of CPL section 190.-25(4).

## IV. *The Sufficiency of the Allegations Under Fed.R.Civ.P. Rule 8(a) and The Motion for a More Definite Statement*

Defendant G & G Concrete Corp. ("G & G") and the individual defendants named in the complaints (except defendants Scopo and Chattin) move to dismiss the complaints under Rule 12(b)(6) as insufficient to satisfy the pleading requirements of Fed.R.Civ.P. 8(a). In the alternative, defendants move for a more definite statement pursuant to Rule 12(e).

G & G is a defendant in the *Century-Maxim* action. In support of its motion to dismiss, G & G points out that the *Century-Maxim* complaint does not allege that G & G committed overt acts in furtherance of the conspiracy. Nor does it allege that G & G supplied the State or the UDC with material or services and is thus liable for treble damages on that basis. Rather, the *Century-Maxim* complaint charges that G & G was a member of the conspiracy and agreed to its terms. In addition, the complaint alleges that between 1981 and 1985, pursuant to and in furtherance of the conspiracy, G & G was allocated major reinforced-concrete superstructure construction work in Manhattan.

Rule 8, which G & G contends has not been satisfied, requires that the pleading parties serve a "short and plain statement of the claim showing that the pleader is entitled to relief." The requirements of Rule 8 as they apply in the conspiracy context have been described as follows:

[T]he general principles of "notice pleading" under Rule 8 apply to pleadings averring conspiracy. However, while Rule 8 demands only a "short and plain statement of the claim showing that the pleader is entitled to relief," in a pleading of conspiracy it is important that within the pleader's ability to do so, and without going into unnecessary detail, the opposing party be informed of the nature of the conspiracy charge, to which he may adequately plead.

It is not enough merely to state that a conspiracy has taken place. Where pos-

sible, there should be some details of time and place and the alleged effect of the conspiracy. This is not to say that the pleader must plead his evidence; further details may be secured by means of discovery, and related devices. Moreover, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading.

2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.17[5] (1986) (footnotes omitted).

■■■■ In this case, the *Century-Maxim* complaint adequately meets these standards.[4] The purpose of and circumstances surrounding the conspiracy have been sufficiently alleged. The theory of the *Century-Maxim* complaint, elaborated upon at oral argument, is that all of the work G & G and its co-defendants performed in the New York City market for major reinforced-concrete superstructure construction between 1981 and 1985 furthered and was pursuant to an unlawful conspiracy. *See* Transcript of Proceedings, 85 Civ. 1887, at 52 (March 26, 1987). Thus, the complaint sufficiently connects G & G to the alleged conspiracy. The failure to allege overt acts on the part of G & G is not fatal. "[A]n overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits." *Waller v. Butkovich,* 584 F.Supp. 909, 931 (M.D.N.C.1984). A defendant who participates in a conspiracy is jointly and severally liable for the full extent of all damages caused by the members of the conspiracy. *Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986). In this case, even if G & G did not supply plaintiff with major reinforced-concrete superstructure construction work, its participation in the conspiracy, if proved, could lead to liability.

The challenge to the complaints which the individual defendants advance is likewise unpersuasive. The individual defendants (other than defendants Scopo and Chattin) are officers and owners of corporate defendants but are charged in their individual capacities with joining and participating in the alleged conspiracy. These defendants claim that the complaints fail to allege facts which would state a claim for relief.

As noted earlier, overt acts need not be proved with respect to each defendant for joint and several liability to attach under applicable conspiracy law. Nevertheless, at least one court in this district has held that to withstand a motion to dismiss, an antitrust conspiracy complaint must be more specific in claims against individuals than against corporations. *See State of New York v. Dairylea Co-Op. Inc.,* 570 F.Supp. 1213, 1216 (S.D.N.Y.1986). In *Dairylea,* which involved an alleged horizontal price-fixing conspiracy in the milk industry, Judge Owen expressed his view that "before a corporate officer or employee should be required to undergo the rigors and expense of defending an action of such sweeping scope, the plaintiff has the obligation to state with some specificity allegations of conduct which would, if proved, render such an individual liable as a participant in the alleged conspiracy." *Id.* at 1216 (footnote omitted). Judge Owen emphasized, however, "the barrenness" of the complaint in that case and the "particularly troublesome" impact that defending a civil suit would have upon "minor employees." *Id.* Forty-nine individuals were charged in the *Dairylea* complaint, and the allegations were unspecific. As Judge Owen observed, "the complaint merely recites their employment with various defendants— some are alleged to be officers, some salesman—and their home addresses and nothing more. It then states that 'the defendants', without further specification, engaged in the described illegal conduct." *Id.*

■■■■ The complaints in the present cases stand on a different footing from the one in *Dairylea.* Here, eight defendants are charged as co-conspirators; none is a minor employee. *See Cedar Park* Amended Complaint ¶¶ 13–18, 24–25. Furthermore, with respect to each of the individual

**4.** We make this observation taking into account our dismissal of the treble damages claims asserted on behalf of unidentified political subdivisions.

defendants, except Nicholas Auletta, the complaints plead specific overt acts. These defendants are thus linked to the conspiracy in the complaints through specific circumstances. With respect to defendant Auletta, no overt act is alleged, but plaintiff charges that as an "officer, director, and principal stockholder" of defendant S & A Concrete Co., Inc., Auletta, "dominated and controlled" that entity. *Cedar Park* Amended Complaint ¶ 13. Paragraph 37(*o*) enumerates eight specific projects allegedly allocated to Auletta's corporation pursuant to the conspiracy. *Id.* ¶ 37(*o*). Under these circumstances and in light of the legal principles which govern the liability of conspirators, we decline to dismiss the complaints against the individual defendants.

Considerations similar to those just discussed mandate denial of the defendants' Rule 12(e) motion for a more definite statement. The complaints provide adequate notice of the nature of the claims. Sufficient detail is provided in the complaints as to the conspiratorial purpose, the terms of the alleged agreement, and acts committed in furtherance thereof. It has been observed that "Rule 12(e) motions are granted sparingly," Wright, Miller & Kane, *Federal Practice & Procedure*, Civil § 1376 at 337 (1986 Supp.), and given the totality of the allegations in the complaints, this is not an appropriate case for the granting of such a motion. "The discovery process is designed to provide whatever sharpening of the issues may be necessary." *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554 (2d Cir.1977).

### V. *Statute of Limitations and Donnelly Act Issues*

Defendants move to dismiss portions of the complaints as time-barred under the applicable statutes of limitations. A considerable period of time was spent on this issue at oral argument; however, it appears that the central legal questions at issue in this connection are currently before the Second Circuit in the appeal from *New York v. Amfar Asphalt Corp.*, 1987–1 Trade Cases .(CCH) ¶ 67,417 (E.D.N.Y. 1986). We reserve resolution of the stat-

ute of limitations issue pending the decision of the Second Circuit in *Amfar* and invite further submissions on the issue after the Second Circuit renders its decision.

We reserve decision as well on the defendants' motions to dismiss the civil penalty claims asserted under the Donnelly Act and to compel the State to elect whether it seeks treble damages or civil penalties. At oral argument, the parties agreed that the Donnelly Act civil penalty claims do not require any discovery or proceedings which would not otherwise occur during the course of the litigation. We recognize that the defendants assert that this Court has no jurisdiction to impose a penalty under the Donnelly Act. It is agreed, however, that should the Court decide that it does have jurisdiction to enter such an order, it would do so only at the conclusion of a trial. Accordingly, we reserve decision until a more appropriate point.

### Conclusion

We grant the motions to dismiss, without prejudice to repleading within sixty (60) days, insofar as the present complaints purport to state treble damages claims other than those asserted on behalf of the State and the UDC. We reserve decision on the statute of limitations and Donnelly Act issues as indicated. All other motions are denied.

SO ORDERED.